**Gerald SAILORS, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 35A02–9202–CR–44.**

Court of Appeals of Indiana,
Second District.

June 8, 1992.

Transfer Denied July 30, 1992.

Susan K. Carpenter, Public Defender, David P. Freund, Deputy Public Defender, Indianapolis, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Lisa M. Paunicka, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

BUCHANAN, Judge.

## CASE SUMMARY

Defendant-appellant Gerald Sailors (Sailors) appeals from his conviction for voluntary manslaughter,[1] a class A felony, claiming that the evidence was insufficient to support his conviction and that the special prosecutor's remarks during closing arguments constitute reversible error.

We reverse and remand for a new trial.

## FACTS

The facts most favorable to the jury's verdict reveal that Sailors was a captain on the Huntington Police Department (HPD). At approximately 12:45 a.m. on June 21, 1990, Sailors drove to the town hall in Roanoke, Indiana. The town marshal saw Sailors exit his car and fall down. As the marshal approached, Sailors said that he needed assistance, that he was hurt and that a person in his car had been shot.

The body of the victim, Michael Fisher (Fisher), was found in the front passenger seat. Fisher had been shot twice, once in the heart and once in the head. Sailors had a laceration above his right eye and his face was swollen. He indicated that he had been choked, but a physician who examined him shortly after he arrived did not notice any bruising or abrasions on his neck.

Fisher and Sailors had met when Fisher worked on some radio equipment for the HPD. The men became friends and socialized with each other for approximately three years. Sailors said that Fisher had indicated that he was interested in working in law enforcement, and that he had offered to work as an undercover drug informant for the HPD. Fisher had also contacted the Adams County Sheriff's Department with a similar offer, but neither department had expressed any interest in using Fisher as an informant.

Sailors explained that, while he was off duty, he had been driving with Fisher in Roanoke during the evening of June 20, 1990. Fisher had claimed to know the location of several "crack" houses operating in Roanoke and offered to show them to Sailors. While Sailors did not follow Fisher to Roanoke, he met him there later in the evening. After the two drank coffee at a truckstop, they drove around Roanoke. Fisher had trouble locating the alleged "crack" houses, and after talking about Fisher's personal problems for a while, Sailors indicated that Fisher was wasting his time and that he had other things to do.

While traveling back to Fisher's vehicle, they discussed Fisher's past problems with marijuana. Fisher indicated that he had one more thing to show Sailors, and directed Sailors to drive out of the town. At some point during their conversation, Sailors stated that Fisher told him he had enough marijuana seeds for next year's crop, and that Fisher then showed him what appeared to be a plastic bag filled with marijuana seeds.

Sailors became angry and told Fisher that he would not put up with that type of

---

1. Ind.Code 35–42–1–3 (1988).

behavior and advised him that he was transporting him to the Huntington jail for possession. According to Sailors, Fisher then suddenly jerked his hands off of the car's steering wheel and that Fisher hit him in the face. Sailors said he was stunned and that Fisher struck him several times in the face and began to choke him. Fisher also threatened to kill Sailors and his family if he was taken to jail.

At this point Sailors said he started to get weak and that he was afraid he would lose consciousness and that Fisher would kill him and his family. So he drew his revolver and shot Fisher, but he was not sure how many times he fired. Initially, he said he attempted to leave through the passenger side of his vehicle, that he opened the door, but stopped when he noticed that Fisher was not moving. Sailors then drove to the Roanoke town hall.

After a jury trial, Sailors was convicted of voluntary manslaughter and sentenced to a 22–year term of imprisonment.

Other pertinent facts will hereinafter appear as to Issue Two.

## ISSUES

While Sailors raises several issues for our consideration, because we reverse, we need only address two:

1. Whether the evidence was sufficient to sustain Sailors' conviction?

2. Whether remarks made by the special prosecutor in closing argument constitute reversible error?

## DECISION

ISSUE ONE—Was the evidence sufficient to support Sailors' conviction?

PARTIES' CONTENTIONS—Sailors claims that the evidence is insufficient to disprove his claim that he acted in self-defense because he reasonably feared he was in danger of serious bodily injury or death. The State responds that the evidence supports a reasonable inference that Sailors was not acting in fear of death or serious bodily injury.

CONCLUSION—The evidence is sufficient.

■ To prevail upon a claim of self-defense, Sailors must establish that he was in a place where he had a right to be, that he acted without fault, and that he had a reasonable fear of death or great bodily harm. *See Holder v. State* (1991), Ind., 571 N.E.2d 1250; *see also* Ind.Code 35–41–3–2 (1988). Once the issue of self-defense has been raised, the State bears the burden of disproving one of these elements, and the State may carry its burden by presenting evidence which is sufficient to convince the trier of fact beyond a reasonable doubt that Sailors, in light of all of the known circumstances, could not have entertained a bona fide belief that he was in danger of death or great bodily harm. *See Shively v. State* (1991), Ind., 578 N.E.2d 644; *Holder, supra.*

■ Sailors argues that the evidence was insufficient to prove beyond a reasonable doubt that he did not reasonably believe he was in danger, particularly in light of the fact that all of the evidence against him was circumstantial. On appellate review of the sufficiency of circumstantial evidence, we need not determine whether the evidence is sufficient to overcome every reasonable hypothesis of innocence, rather, it is sufficient if inferences may be reasonably drawn from the evidence that support the verdict beyond a reasonable doubt. *Bustamante v. State* (1990), Ind., 557 N.E.2d 1313.

■ The State claims that the evidence supports reasonable inferences that Sailors was not acting in fear of his life when he shot Fisher. The State points to the testimony of a nurse at the hospital, that she did not see anything wrong with Sailor's neck, *record* at 435, and the testimony of the physician who examined Sailors, that he did not see any of the physical indications that he would expect to see if Sailor had been choked. *Record* at 422, 425. The State claims this evidence supports an inference that Fisher did not choke Sailors as he stated and that Sailors was therefore not acting in fear for his life when he shot Fisher.

Sailors attacks the doctor's testimony as insufficient because the doctor also testi-

fied that while he did not remember seeing any bruising or abrasions around Sailors' neck, he later admitted that photographs taken of Sailors when he was at the emergency room showed redness around the neck, and further that redness is consistent with trauma to the neck such as choking. *Record* at 424–25, 430–31. Sailors also highlights the doctor's testimony that, in his experience, physical signs of choking become more pronounced as time passes, *record* at 427–30, and that he had examined Sailors shortly after the incident. *Record* at 420.

Sailors contends this testimony established that the doctor examined him before the physical manifestations of the choking became pronounced and that the doctor's testimony was therefore consistent with his statement that Fisher choked him. Sailors also points to the testimony of one of Sailor's fellow Huntington police officers that Sailors had distinct choke marks on his neck the morning following the incident. *Record* at 771–72.

While Sailors has established that the evidence concerning whether Fisher choked him is conflicting, we cannot substitute our judgment for that of the jury and reweigh the evidence to resolve the conflict in Sailors' favor. *Holder, supra.* The doctor's and the nurse's testimony support an inference that Sailors was not choked, which supports the State's contention that he did not reasonably believe himself to be in danger of death or serious bodily injury when he shot Fisher.

The State also relies upon the testimony of several expert witnesses concerning the splatter pattern of Fisher's blood in Sailors' car and the fact that one of the bullets fired by Sailors was not recovered, *record* at 635–41, 655–56, as supporting an inference that Sailors' passenger door was open when he shot Fisher. The State argues this evidence established that the shooting did not occur as Sailors had stated and that his version of the events was not credible.

Sailors finds the testimony of the blood splatter expert to be insufficient because the expert testified that he concluded the passenger door must have been ajar because a non-high velocity blood splatter[2] was found in the door frame, and that the blood could not have landed there if the door was closed. *Record* at 641, 648. Sailors points to testimony which established that part of the door frame is visible even when the door is closed, *record* at 653, to support his contention that the expert's testimony does not prove the door was slightly open when the shot was fired.

Sailors also asserts that the fact one of the bullets was not recovered does not demonstrate that the door was open because the bullet could have fallen out when he opened the passenger door after he shot Fisher. Sailors emphasizes that he related his opening of the passenger door before it was determined that the second bullet could not be located and that other physical evidence, such as the dents and other marks on the door and door frame, also rebut the State's theory that the car door was slightly ajar when Fisher was shot.

Again, even though the evidence is conflicting, we must defer to the jury the task of weighing the evidence. The testimony supports inferences that Sailors' version of the incident was not accurate and that he was not a credible witness. The relative weight of these inferences is not for us to decide, and Sailors' arguments amount to requests that we reweigh the evidence. *See Holder, supra.* Although conflicting inferences arise from the evidence, we must conclude that the evidence does support an inference that Sailors did not reasonably fear for his life when he shot Fisher, and is therefore sufficient to sustain his conviction. *See Shively, supra.*

ISSUE TWO—Did the special prosecutor's remarks during final argument deny Sailors' right to a fair trial?

PARTIES' CONTENTIONS—Sailors strongly urges that the special prosecutor's references to the grand jury during his closing argument placed him in a position of grave peril and denied his right to a fair

**2.** "Non-high velocity blood splatter" is a drop or droplet of blood that is larger than the atomized blood drops or mist which result when a bullet passes through a body. *Record* at 500, 636–37.

trial. The State replies that the error was harmless because "the evidence overwhelmingly supports the Defendant's conviction." *Appellee's brief* at 13.

CONCLUSION—Sailors was denied his right to a fair trial and his conviction must be reversed.

■ During closing arguments, the special prosecutor made the following remarks:

> "The charges were returned by the grand jury of the Huntington County Circuit Court. You are actually the second jury to consider this matter. These charges were not filed by a prosecutor, special or otherwise. The indictment was returned by six of your fellow citizens. You are the trial jury. The second jury to consider this matter."

*Record* at 801. Then during rebuttal, the special prosecutor also said: "It has been investigated. He has been indicted by your grand jury...." *Record* at 837.[3] No objection was made to these remarks.

The special prosecutor's comments were highly prejudicial. While no Indiana court has expressly considered references to a grand jury during closing arguments, our supreme court in *Jackson v. State* (1889), 116 Ind. 464, 19 N.E. 330, reversed a conviction when the prosecutor said: "I know what I am talking about. I have been to Greenfield, and heard the evidence before the grand jury, and I know what people there think about this case." *Id.* at 466, 19 N.E. at 331.

Indiana courts have condemned attempts to minimize in the minds of the jurors the seriousness of their task by informing them that a sentence might be suspended, that the defendant might be released on parole, or that the conviction could be reversed on appeal if an error had been made. *See Dailey v. State* (1980), 273 Ind. 595, 406 N.E.2d 1172; *Kelley v. State* (1936), 210 Ind. 380, 3 N.E.2d 65; *Davis v. State* (1928), 200 Ind. 88, 161 N.E. 375; *Hadley v. State* (1975), 165 Ind.App. 416, 332 N.E.2d 269.

Other jurisdictions have been more explicit. In *Acevedo v. State* (1985), Miss., 467 So.2d 220, the Mississippi supreme court reversed a conviction when the prosecutor repeatedly referred to various improper matters, including the fact that the defendant had been indicted by a grand jury. The court concluded the prosecutor's comments prejudiced the defendant even though the trial court had admonished the jury to disregard the comments.

The court in *Sparks v. State* (1978), Tenn.Crim.App., 563 S.W.2d 564, reversed the defendant's conviction when the prosecutor remarked that the grand jury had shouldered its responsibility, along with the legislature, governor and sheriff, when it indicted the defendant.

Some courts have concluded that the bare mention of the grand jury does not necessarily amount to reversible error. *See Commons v. State* (1951), 36 Ala.App. 86, 52 So.2d 415; *Fulgham v. State* (1980), Miss., 386 So.2d 1099; *State v. Summers* (1973), 284 N.C. 361, 200 S.E.2d 808; *State v. Krause* (1951), 260 Wis. 313, 50 N.W.2d 439. The court in *Hardison v. State* (1950), 81 Ga.App. 345, 58 S.E.2d 480, concluded that the prosecutor's reference to the grand jury was rendered harmless by the trial judge's admonishment that a grand jury indictment raised no presumption or inference against the defendant and should not be considered as having any evidentiary value.

The most concise judicial pronouncement, however, was uttered by the supreme court of South Carolina in *State v. Thomas* (1986), 287 S.C. 411, 339 S.E.2d 129. The court's entire unanimous opinion provided:

> "Appellant was convicted of armed robbery and assault and battery of a high and aggravated nature arising out of an assault on an elderly store clerk. We reverse and remand for a new trial.
>
> During closing argument, the solicitor told the jury the case had already been examined by a magistrate and a grand

---

**3.** Throughout the appellant's brief, Sailors observed that the special prosecutor misrepresented the evidence several times during his closing argument, but Sailors has not raised any separate appellate issue with respect to these misstatements.

jury, and a preliminary hearing had been held. He also said an appeal would enable a higher court to review any decision made by them.

*We have repeatedly condemned closing arguments that lessen the jury's sense of responsibility* by reference to preliminary determinations of the facts. [Citations omitted]. We have also found error where the jury was advised their decision was subject to appellate review. [Citation omitted].

These statements to the jury are improper because they inject an arbitrary factor into jury deliberations. *The danger is that a juror might be persuaded to rely on the opinion of others instead of exercising his independent judgment as to the facts.* 75 Am.Jur.2d *Trial* § 261, p. 338. 'Jurors are simply not to consider the opinions of neighbors, officials or even other juries.' *State v. Smart,* 278 S.C. 515, 526, 299 S.E.2d 686 (1982). We caution solicitors that arguments of this kind can rarely be harmless.

In light of our reversal on this issue, it is unnecessary to reach appellant's other exceptions.

REVERSED AND REMANDED."

*Thomas, supra* (emphasis supplied).

The special prosecutors repeated statements that the jury was "the second jury to consider the matter" and his comment that the indictment was "returned by six of your fellow citizens" were clearly exhortations to the jury to convict Sailors because other people thought he was guilty. We agree with the *Thomas* court's condemnation of this type of argument. It is highly inappropriate to ask a jury to convict a defendant because someone else thinks the defendant is guilty. It is axiomatic that the fact a defendant was indicted by a grand jury is irrelevant to the issue of a defendant's guilt.

■ Because no objection to the special prosecutor's comments was made, we must determine whether those improper comments constitute fundamental error. A fundamental error is a substantial blatant violation of basic principles rendering a tri-al unfair to the defendant, and which, if not corrected would deny the defendant fundamental due process. *Hart v. State* (1991), Ind., 578 N.E.2d 336; *Jackson v. State* (1991), Ind., 575 N.E.2d 617.

■ Sailors must demonstrate that the special prosecutor's conduct subjected him to "grave peril" and had a probable persuasive effect on the jury's decision. *Scherer v. State* (1990), Ind., 563 N.E.2d 584. When reviewing a claim of fundamental error, we must consider the character of the error and its effect on the trial as a whole. *Kremer v. State* (1987), Ind., 514 N.E.2d 1068.

■ The State acknowledges that the special prosecutor's comments were inappropriate, but claims that any error was harmless because "the evidence overwhelmingly supports the Defendant's conviction." *Appellee's brief* at 13. While we have concluded that the evidence was sufficient to sustain Sailors' conviction, we cannot, in all fairness, agree that the evidence was "overwhelming."

Sailors was convicted on the basis of inferences drawn solely from circumstantial evidence. Those inferences were hotly contested at trial, and the evidence strongly supports conflicting inferences. Because of the close nature of the evidence against him and the paramount importance of his credibility, under these particular facts, we conclude that Sailors has demonstrated a sufficiently substantial potential for harm arising from the special prosecutor's improper comments to establish that he was placed in grave peril and denied a fair trial. *See Hossman v. State* (1985), Ind.App., 473 N.E.2d 1059, *trans. denied.* The special prosecutor's comments, therefore, constituted fundamental error under the facts of this case.

Judgment reversed and remanded for a new trial.

SULLIVAN and STATON, JJ., concur.